**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

BLACK SHEEP TELEVISION, LTD.,

    Plaintiff/Counterclaim-Defendant,

             v.

THE TOWN OF ISLIP, a municipal
corporation of the State of New York,

    Defendant/Counterclaim-Plaintiff.

Civil Case No. 2:10-CV-04926 (LDW)(ARL)

---

MEMORANDUM OF LAW OF DEFENDANT/COUNTERCLAIM-PLAINTIFF
THE TOWN OF ISLIP IN SUPPORT OF APPLICATION FOR ORDER TO SHOW
CAUSE AND PRELIMINARY INJUNCTION TRANSFERRING DOMAIN
NAMES AND FOR OTHER RELIEF

---

CONNELL FOLEY LLP
Peter J. Pizzi
888 Seventh Avenue, Suite 3401
New York, New York 10106
Telephone: (212) 262-2390
Facsimile:  (212) 262-0050
ppizzi@connellfoley.com

*Attorneys for Defendant/Counterclaim-Plaintiff*
*The Town Of Islip*

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 4

    A.    The Town of Islip's Rights in the AIRPORT MARKS Are Clear. ........................... 4

    B.    Black Sheep Has Repeatedly Attempted to Sell to the Town, and
        Continues to Wrongfully Profit from, <macarthurairport.com> and
        the Resolving Domain Names ................................................................. 7

    C.    The Content at <macarthurairport.com> Grievously Misleads The
        Public And Causes Irreparable Harm to the Airport. ................................ 11

    D.    Black Sheep's UDRP Filings Confirm Its Status as a Cybersquatter. ................. 13

ANALYSIS ................................................................................................... 13

    I.    THE TOWN IS ENTITLED TO PRELIMINARY RELIEF
       TRANSFERRING THE DOMAIN NAMES ........................................... 13

    A.    BLACK SHEEP'S CONDUCT IS CAUSING IMMEDIATE AND
       IRREPARABLE HARM TO THE PUBLIC AND THE AIRPORT ...................... 14

    B.    THE TOWN OF ISLIP IS LIKELY TO SUCCEED ON THE
       MERITS OF ITS ACPA CLAIM ..................................................... 15

        1.    <**Macarthurairport.com**> and the Resolving Domain
            Names are Being Used with a "Bad Faith Intent to Profit"
            from the Town ................................................................. 16

        2.    <Macarthurairport.com> and the Resolving Domain Names
            are Identical or Confusingly Similar to the AIRPORT
            MARKS and Will Continue to Cause Confusion if Not
            Transferred to the Town ...................................................... 19

        3.    The AIRPORT MARKS Were Strong and Distinctive At the
            Time Black Sheep Registered <macarthurairport.com> and
            the Resolving Domain Names ................................................ 21

    II.    BLACK SHEEP HAS NO DEFENSE TO THE TOWN'S REQUEST
       FOR INJUNCTIVE RELIEF ......................................................... 24

CONCLUSION ............................................................................................... 26

i

# TABLE OF AUTHORITIES

*Cases*

Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1976) .................................................................................................... 23

*Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442 (S.D.N.Y. 2008) ........................................................................................ 18

*Broadbridge Media, L.L.C. v. hypercd.com*, 106 F. Supp. 2d 505 (S.D.N.Y. 2000) ........................................................................................ 17

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir. 1986).................................................... 14

*Costello v. United States*, 365 U.S. 265 (1961) ........................................ 28

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 33 U.S.P.Q.2d 1961 (E.D.N.Y. 1994) ........................................................ 26

*Dudley v. Healthsource Chiropractic, Inc.,* 585 F. Supp. 2d 433 (W.D.N.Y. 2008) ...................................................................................... 20

*E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505 (S.D.N.Y. 2008)........................................................................................ 15

*Flacke v. NL Indus., Inc.*, 644 N.Y.S.2d 404 (N.Y. App. Div. 1996).......................................................................................... 27

*Fourth Toro Family Ltd. Partn. v. PV Bakery, Inc.*, 88 F. Supp. 2d 188 (S.D.N.Y. 2000) ...................................................................................... 27

*FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001).................................. 27

*Green Prods. Co. v. Independence Corn By-Prods. Co.*, 992 F. Supp. 1070 (N.D. Iowa 1997)...................................................................................... 20

*GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273 (S.D.N.Y. 2002) .................................. 25

*Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458(RJS), 2010 WL 308303 (S.D.N.Y. Jan. 20, 2010)................................................................ 15

*Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946 (2d Cir.1981).................................... 28

*Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298 (6th Cir. 2001) ............................................................................................ 26

*Hermès Intl. v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104 (2d Cir. 2000) ............................................................................................ 28

ii

*Inc. Village of Garden City v. Genesco, Inc.*, 596 F. Supp. 2d 587 (E.D.N.Y. 2009) ........................................................................................ 27

*Kellogg Co. v. Exxon Corp.*, 209 F.3d 562 (6th Cir. 2000) ...................... 26

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123 (S.D.N.Y. 1993) ............................................................................... 14, 19

*Matter of Fowler v. City of Saratoga Springs*, 626 N.Y.S.2d 306 (N.Y. App. Div. 1995) ..................................................................................... 27

*Multi-Local Media Corp. v. 800 Yellow Book Inc.*, 813 F.Supp. 199 (E.D.N.Y. 1993) ....................................................................................... 15

*New York State Soc. of Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331 (S.D.N.Y. 1999) .......................................... 22

*Pfizer, Inc. v. Sachs*, 652 F. Supp. 2d 512  (S.D.N.Y. 2009) ...................... 18

*Philip Morris USA Inc. v. Cowboy Cigarette Inc.*, No. 03 Civ. 2292 (JSR), 2003 WL 22852243 (S.D.N.Y.) ....................................................... 23

*Planned Parenthood Fed'n of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430 (S.D.N.Y. 1997) .................................................................................. 22

*Pocono Int'l Raceway, Inc. v. Pocono Mountain Speedway, Inc.*, 171 F. Supp. 2d 427 (M.D. Pa. 2001) ........................................................... 25

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945) ..................................................................................................... 28

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62 (2d Cir. 2002) .............................. 26

*Reno Air Racing Ass 'n, Inc. v. McCord*, No. CV-N-02-0474 (HDM) (RAM), 2004 WL 3561191 (D. Nev.) ................................................... 25

*Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980) ............................... 28

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001) .................................... 20

*Simon & Schuster Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279 (S.D.N.Y. 1997) ..................................................................................................... 23

*Solow Bldg. Co. v. Nine West Grp., Inc.*, 48 Fed. Appx. 15 (2d Cir. 2002) ................................ 27

*Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489 (2d Cir. 2000) ..................................................................................................... 16

*The Vanguard Group, Inc. v. Emilio Sa*, WIPO Case No. D2001-1453 ...................................... 10

*Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208 (2d Cir. 1985).................................................. 23

*Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339 (S.D.N.Y. 1998) ........................................ 24

*U.S. v. Angell*, 292 F.3d 333 (2d Cir. 2002) ............................................................................... 26

*United States v. Alfano*, 34 F. Supp. 2d 827 (E.D.N.Y. 1999) ...................................................... 27

*United States v. Lemos*, 2010 WL 1192095 (S.D.N.Y. 2010) ....................................................... 26

*United States v. Portrait of Wally*, 663 F. Supp. 2d 232 (S.D.N.Y. 2009) ................................... 26

*Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003) ......................................................... 13

*Vogster Entertainment, LLC v. Mostovoy,* No. 09 Civ. 1036, 2009 WL
    691215 (E.D.N.Y. Mar. 16, 2009) .............................................................................. 16, 17, 20

*Webadviso v. Bank of America Corp.*, No. 09 Civ 5769, 2009 WL
    5177997 (S.D.N.Y. Dec. 31, 2009) ............................................................................................. 15

*Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009)................................................. 13, 15

### *Statutes*

15 U.S.C. § 1114(2)(D)(v) ............................................................................................................... 2

15 U.S.C. § 1125(d)(1) ............................................................................................................. 16, 17

## PRELIMINARY STATEMENT

Since the 1940s, Long Island MacArthur Airport (the "Airport") has served the Long Island community. The Airport, which is operated by Defendant/Counterclaim-Plaintiff Town of Islip, serves over two (2) million passengers annually on an average of sixty (60) scheduled flights per day. It is known to most as MACARTHUR AIRPORT and ISLIP AIRPORT, and in the 1960s was called ISLIP MACARTHUR AIRPORT. In 1978, it was formally renamed LONG ISLAND MACARTHUR AIRPORT. The Airport code is "ISP," which is how some refer to the Airport.  In 2009, the Airport launched a marketing and branding campaign, which involved the launch of <**flylima.com**>[1] as the Airport's web presence and the promotion of the corresponding mark FLYLIMA.COM. The AIRPORT MARKS (as defined in the Verified Counterclaim) have each become distinctive through continuous and exclusive use in connection with the Airport, most for over sixty (60) years, familiarity to the public, air travelers and the airline industry in general, and efforts by the Town to promote the Airport.

In August 2010, the Airport commenced an arbitration proceeding against Plaintiff/Counterclaim-Defendant Black Sheep Television Ltd., under the Uniform Domain Name Dispute Resolution Policy (UDRP) of the Internet Corporation For Assigned Names and Numbers (ICANN) to obtain nine (9) domain names, including <**macarthurairport.com**>, each of which incorporated all or part of the AIRPORT MARKS. Declaration of Peter J. Pizzi dated November 5, 2010, Exhibit C.[2] The domains referenced in the UDRP proceeding are set forth in Exhibit B. On October 11, 2010, the URDP panel issued a comprehensive decision in favor of the Airport, directing the transfer of each of the domain names to the Town, finding that Black Sheep had engaged in cybersquatting with respect to each. (Exhibit A). In order to stay the transfer of the domain names, Black Sheep filed this action seeking a declaration that its use of the domain

---

[1] The mark "LIMA" is based upon the first letters of the Airport's formal name, Long Island MacArthur Airport.
[2] Unless otherwise indicated, references to "Exhibit" shall mean those exhibits attached to the Pizzi Declaration.

1

names is not unlawful as well as damages. The Airport now seeks this Court's order compelling Black Sheep to relinquish the nine (9) domain names in question in the UDRP proceeding and seven (7) other domains also infringing upon the AIRPORT MARKS and other relief. A list of all disputed domain names in this matter is attached as Exhibit B.

No issue of fact exists with regard to the elements of cybersquatting prohibited by the Anticybersquatting Consumer Protection Act (ACPA)[3]: (i) the use of domain names that are identical or confusingly similar to the distinctive Airport's trademarks and (ii) a bad faith intent on the part of Black Sheep to profit from the Airport's trademarks. This issue is ripe for determination because most of the operative facts are suitable for judicial notice and all of the key facts were set forth in UDRP filings by both parties, which included sworn declarations of Black Sheep's principal and its legal counsel. (Exhibits LL and WW).

The public interest calls for this issue to be resolved promptly. The traveling public and the Airport, which is owned by the public, suffer on a daily basis from confusion due to Black Sheep's continued and flagrant use of the Airport's trademarks in the sixteen (16) domain names referenced above. The Airport keeps a log of telephone calls it receives from travelers who believe Black Sheep's <**macarthurairport.com**>[4] site is operated by the Airport and want to complain about inaccurate information on the site. During the period of July through October 2010, some forty-five (45) separate complaints were lodged by members of the public about content at <**macarthurairport.com**>, with each complainant believing *the Airport* was responsible for the erroneous content. (Exhibit H and EE). For each person moved enough by confusion to call the Airport and leave contact information, no doubt dozens or hundreds of other Long Island residents are similarly vexed by <**macarthurairport.com**>'s misleading domain name and content. One

---

[3] 15 U.S.C. § 1114(2)(D)(v).
[4] When entered into an Internet browser address bar, each of the disputed Internet domain names automatically redirect or "resolve" to <**macarthurairport.com**>.  As such, throughout this brief, unless otherwise indicated, either the single domain name "<**macarthurairport.com**>" or the phrase "<**macarthurairport.com**> and the resolving domain names" will be used to collectively refer to all the disputed domain names in this matter.

recent example illustrates the harm the public and the Airport suffer each day. On August 11, 2010, a Long Island resident used one of the unlicensed car services that advertise on <**macarthurairport.com**>; the taxi never arrived, and the individual nearly missed her flight and spent $140 in parking fees which she demanded that *the Airport* refund because she mistakenly believed <**macarthurairport.com**> was the Airport's site. (Exhibit EE). Had the individual been aware <**macarthurairport.com**> was not the official Airport site, the individual may have been wary of utilizing car services not expressly approved by the Airport.

Black Sheep's own business records submitted in the UDRP process present voluminous, disturbing examples of confused members of the traveling public reaching out to Black Sheep for information about air travel, air safety and other sensitive topics. Exhibit PP. In one instance, a military spouse emailed Black Sheep to ask whether relatives may greet veterans returning from Afghanistan at the Airport gate. *Id*. Other emails ask Black Sheep about the speed of TSA security checks, the time to arrive before a flight, and the impact of weather conditions on travel. (Exhibit PP at 2, 3, 4, 5, 11, of 24). Black Sheep blithely fields these questions, using the "Admin" email signature block, conveying the impression that Black Sheep is indeed part of the administration of Long Island MacArthur Airport, an outrageous falsehood. *Id*. Black Sheep also admits receiving telephone inquiries *too numerous to quantify*: "Plus, I can't tell you how many phone calls we get a week!!!  Somebody from Dubuque, Iowa. No kidding ... no joke. They can't get anybody at the airport, and/or they get the numbers wrong sometimes and find our number, you know..." The previous excerpt taken from Black Sheep's UDRP submission – Exhibit NN at 5 of 17 – shows that due to the deceptive nature of the site, Black Sheep also regularly receives emails presenting commercial opportunities intended for the Town of Islip – the entity which operates the Airport and whose taxpayers built it. (Exhibit PP at 11-24).  There is likely no way to know how many of these inquiries ever reached Airport personnel. The evidence of confusion by the public is

<div align="center">3</div>

overwhelming and requires transfer of the domains to their rightful owner – the entity that owns the Airport's trademarks – on the return date of the Order to Show Cause sought by this application.

## STATEMENT OF FACTS

**A.      The Town of Islip's Rights in the AIRPORT MARKS Are Clear.**

*The Town Has Continuously and Exclusively Used the AIRPORT MARKS*

The Town's application for a preliminary injunction rests upon the Town of Islip's common law and/or statutory rights to the AIRPORT MARKS. The Airport has been in existence since the 1940s, and accommodates over two (2) million passengers per year, with the capacity and infrastructure to serve approximately four (4) million passengers annually. Today, the Airport is known by each the AIRPORT MARKS, with LONG ISLAND MACARTHUR AIRPORT being the most dominant mark. (Verified Counterclaim ¶ 3).

The ISLIP AIRPORT and ISP word marks have become well known through their continuous and exclusive use in connection with the Airport since the 1940s throughout the United States.  Data available from Google shows that the term "Islip Airport" is searched approximately 27,100 times each month. (Exhibit J). Passengers are also reminded of the Islip Airport name by the "ISP" three-letter code designated by the International Air Transport Association to identify the Airport, which uses three letters of the word ISLIP.  Data available from Google shows that the term "ISP Airport" is searched approximately 4,400 times each month.  *Id.*

The ISLIP MACARTHUR AIRPORT word mark has become well known through its continuous and exclusive use in connection with Complainant since the Airport was officially named "Islip MacArthur Airport" in the 1960s.  Data available from Google shows that the term "Islip MacArthur Airport" is searched approximately 8,100 times each month. (Exhibit J).

The MACARTHUR AIRPORT and LONG ISLAND MACARTHUR AIRPORT word marks have become well known through their continuous and exclusive use in connection with Complainant's Airport since the 1940s and 1978, respectively, throughout the United States. In fact, the Airport is the only airport incorporating the famous General MacArthur's name.[5] The Airport currently provides service to cities across the United States, including regular service to Birmingham, Alabama; Houston, Texas; Las Vegas, Nevada; Salt Lake City, Utah; San Diego, California; Seattle, Washington; and others. (Exhibit V). Data available from Google shows that the term "MacArthur Airport" is searched approximately 49,500 times each month and "Long Island MacArthur Airport" is searched approximately 14,800 times each month. (Exhibit J).

In addition, the Town applied for and was granted registration for LONG ISLAND MACARTHUR AIRPORT on the Principal Register of the US Patent and Trademark Office ("USPTO") under Registration No. 3597990. (Exhibit K). On October 6, 2008, the Town also filed a trademark application for the AIRPORT WINGS DESIGN MARK. Federal registration of the AIRPORT WINGS DESIGN MARK was granted on April 7, 2009, under Registration No. 3602444. *Id*. The AIRPORT WINGS DESIGN MARK, which incorporates the LONG ISLAND MACARTHUR AIRPORT mark, has become famous throughout the United States as a result of its continuous and exclusive use in connection with the Airport since 1989, when the Town enacted a welcome sign to the Airport on which the LONG ISLAND MACARTHUR AIRPORT word mark appeared together with the AIRPORT WINGS DESIGN MARK. (Exhibit I).

The FLYLIMA.COM word mark has become well known through its continuous and exclusive use in connection with the Town since the extensive marketing and branding campaign

---

[5] Nor is there any question that the surname MACARTHUR can be trademarked, as evidenced by the trademark registrations of MACARTHUR CENTER and MACARTHUR PARK (registrations in connection with good and services unrelated to aviation).  (Exhibit M).

launched in 2009 by the Town promoting the FLYLIMA MARKS, including the Town's use of <**flylima.com**> as the Airport's web presence.

*The mark MACARTHUR AIRPORT Has Gained Powerful Secondary Meaning*[6]

In addition to the Airport's lengthy and exclusive use of the MACARTHUR surname in connection with aviation services, the success of the Airport is apparent through the Airport's considerable expansion. (Verified Counterclaim ¶ 15-26). The Airport has expended considerable funds to promote and expand, and revenues generated from the Airport's operation amount to over $12 million. *Id.*; (Exhibit N).

Since the 1940s, the Airport has also been providing a critical service to the public, airport customers, and the airline community by disseminating accurate information regarding the Airport as deemed necessary and as required by statute. Additionally, the Airport attempts to provide routine Airport status updates to consumers, to publicize Airport-related information such as security guidelines and terminal information, to maintain a "lost and found" for the Airport and to provide contact information for Airport security.  Over the years, there have also been numerous examples of unsolicited media coverage of the Airport and events occurring in and around the Airport. (Exhibits O and R).

*The marks ISLIP AIRPORT, ISLIP MACARTHUR AIRPORT and ISP Have Gained Powerful Secondary Meaning*

The Town's common law rights in the marks ISLIP AIRPORT, ISLIP MACARTHUR AIRPORT, and ISP derive from their continuous and exclusive use in connection with the airport as well as their distinctive nature, giving rise to secondary meaning in the marks.  Despite the facially geographic character of the marks, each designates a distinct facility – MacArthur Airport – as opposed to describing a general geographic location, and there is only one commercial airport

---

[6] There has been no dispute, and there can be no doubt, that the FLYLIMA MARKS have been continuously and exclusively in use by the Town and are distinctive in nature.  Also, the Town's registered marks are presumed distinctive pursuant to the registrations thereof.

in Long Island owned by the Town of Islip. In addition to the distinctive nature of the marks, over the years, the marks have all been used in a trademark way, i.e. to distinguish the goods or services of the Town from the goods or services of any other person in trade. ISLIP AIRPORT was the official name of the Airport for over fifteen (15) years. ISLIP MACARTHUR AIRPORT was the official name of the Airport for over ten (10) years. ISP has been the unique Airport code for the Airport, upon information and belief, for over six (6) decades. The Airport is also still often referred to as ISLIP AIRPORT and ISLIP MACARTHUR AIRPORT in numerous news articles and unsolicited media coverage of its operations and its uniqueness as a regional and exceptionally convenient travel facility. (Exhibit R). The ISP mark is also used in a trademark manner through its placement on, among other things, Airport baggage tags, flight monitors, Airport tickets, and all flight purchase and availability search engines. The uses of the marks show continuous, lengthy and exclusive trademark uses sufficient to show the Town of Islip's acquisition of secondary meaning and resultant common law rights in the marks.

**B.      Black Sheep Has Repeatedly Attempted to Sell to the Town, and Continues to Wrongfully Profit from, <macarthurairport.com> and the Resolving Domain Names**

It is undeniable that Black Sheep registered and continues to use the disputed domain names incorporating the AIRPORT MARKS in an effort to capitalize on the widespread recognition of and goodwill associated with the AIRPORT MARKS going back to the 1940s. Black Sheep registered <**macarthurairport.com**>, <**islipairport.com**>, and <**islipmacarthurairport.com**> during the "dot-com bubble" in 2000 and clearly saw an advantage in acquiring domain names associated with such well-known service marks. Black Sheep even admits it registered the domains to pretend it was the Airport. The Declaration of Jacques Ditte (Black Sheep's principal) filed in the UDRP proceeding crows about this accomplishment: "In 2000, while casually searching the internet, I discovered that there were no

registered domain names for Macarthur Airport.  At that point, I decided to purchase the domain Names;  [sic]  nymacarthurairport.com, **macarthurairport.com**, islipairport.com, and islipmacarthurairport.com." (Exhibit LL ¶ 3). Black Sheep further admitted to the UDRP panel that it set out to offer "a MacArthur Airport website" and has operated "the Macarthur [sic] Airport website for nearly ten years." (Exhibit KK at 3).

Almost immediately upon registering <**macarthurairport.com**>, Black Sheep approached Town officials seeking to profit from what it had done.  Black Sheep sought from the Town a price for the use of <**macarthurairport.com**> above and beyond the costs of acquiring of the domain name. In response, Black Sheep's principal, Jacques Ditte ("Ditte"), says he was told that "[w]e were persona non grata, 'you have an illegal website'" …. "'you can't be operating that.'" (Exhibit NN at 5 of 17).[7]  Following that early rebuke from the Town, Black Sheep consistently concealed its own identity in the pages of <**macarthurairport.com**> so it could free-ride on the Airport's fame. As of the UDRP filing, Black Sheep's name appeared *no where* on its web site. (Exhibit Q). Where clarity is called for, Black Sheep engenders confusion about whether <**macarthurairport.com**> is the "official" Airport website; generating advertising revenue for Black Sheep from its seizure of a domain referencing a prestigious local amenity.[8]

Black Sheep's interactions with the Town in 2007 further evidence its attempt to leverage <**macarthurairport.com**> in exchange for monetary compensation from the Town. After an administration change, the Airport administration was determined to improve the Airport's own web presence and therefore became increasingly concerned about inaccurate information throughout <**macarthurairport.com**>.  With the experience of 9/11 and United Flight 93 in her

---

[7] That the Town chose not to pursue legal action against Black Sheep at that time, due to the constraints inherent to any government entity, is legally irrelevant.  *See* Analysis at III below.

[8] In Exhibit NN at 9 of 17, Ditte repeatedly calls the Airport a "gem" which he "discovered" in 2000.  What he discovered in 2000, of course, was not the Airport itself but the availability of domains identical to the AIRPORT MARKS.  This same passage concedes profitability making clear that the level of "hits" produces serious revenues that have been "growing ever since" registration.

2435995-01

aviation background, Teresa Rizzuto recognized that a robust public information capability was as much a part of airport operation as insuring that the Airport functions smoothly. (Exhibit E, Rizzuto Decl., ¶ 17-20). Yet <**macarthurairport.com**> proved a persistent obstacle to operation of the Airport. It is the intuitive domain for the Airport, it uses the AIRPORT MARKS, and each day its irresponsible content brings new harm to the Airport and the traveling public.

In Black Sheep's own description of the 2007 meetings with the Town, it agreed with a summary of *the 2000 meeting* that confirms that that *first* meeting involved a financial proposal by Black Sheep. At the outset of the December 2007 meeting[9], Eric Hofmeister provided to "Mike," an individual who had not attended the prior meeting in November 2007, a short history of Ditte's interaction with Town officials:

> Eric: You know when they [Black Sheep] grabbed the names, you know they came to the town and said, Hey, you know, why don't we get together and do this, it could be a good thing and you know obviously, you know better than any of the rest of us sitting here at the table, is what . . .
>
> Mike: How heavy the beating was, yes!  [All laugh]
>
> Ditte: Well, the beating was we were persona non grata, "you have an illegal website."
>
> Jan Hanna: "You can't be operating that."
>
> Ditte: "Operating that."  Our attorneys said "to come and get us," basically because you [the Town] have no jurisdiction on what we're doing, we're not doing anything illegal. We're certainly serving information about a government site and we're operating in good faith and there's nothing we can do, but our first intention was to say "Hey, let's work together."
>
> Hanna: Want to work together, we wanted to work with you and,
>
> Eric: So ….
>
> Ditte: We got stonewalled, stonewalled from the town people at the town, when we called they would say, "we can't even talk to you" and hang up the phone on us. I mean that's literally what it was so we're . . .. [Exhibit OO at 2]

---

[9] Ditte and Hanna are representatives of Black Sheep. The balance of the attendees were Town employees.

In the 2007 meetings, Black Sheep also continually confirmed that a relationship akin to a partial sale, or a rental of space on <**macarthurairport.com**>, was Black Sheep's ultimate goal – "what we've wanted all along".  (*See, e.g.*, Exhibit NN at 17 and OO at 21).[10]

On May 13, 2009, the Airport's IP counsel sent a cease and desist letter to Black Sheep pertaining to <**macarthurairport.com**> and <**islipairport.com**> and content located at the site. (Exhibit P).  One month later, Black Sheep registered ALL of the remaining thirteen (13) domain names (except for <islipmacarthurairport.com> which the Town had been unaware had been registered in 2000 by Black Sheep), obviously seeing an advantage in acquiring domain names associated with the well-known AIRPORT MARKS, particularly once the Town expressed a definite interest in such domain names. (Exhibit B). These 2009 registered disputed domain names automatically forward to <**macarthurairport.com**> and thus are also being used in a bad faith manner, i.e. to drive traffic to an infringing site. Black Sheep continued in this pattern of cybersquatting by not only registering the numerous disputed domains, but by also registering in 2009 numerous Twitter accounts using the AIRPORT MARKS.

Furthermore, in 2010, Black Sheep once again offered the domain for sale, this time for $250,000. (Exhibit G and WW).[11]  The UDRP Declaration of Black Sheep's counsel admits that a figure of $250,000 was proposed by Black Sheep, but suggests that a contract calling for payments of $25,000 per year for ten (10) years was intended, not an outright sale. (Exhibit WW). The distinction is without a difference: Black Sheep has continually sought to profit from its 2000 registration of a domain name incorporating the Airport's distinctive, powerful and well-known

---

[10] The Town employees meeting Black Sheep repeatedly sought during the 2007 meetings to correct the abundant inaccuracies in <macarthurairport.com> because of the daily harm to the traveling public and to the Airport.  It was Ditte who returned to the subject of selling the domains outright. Ditte stated in the November 2007 meeting. (Exhibit NN at 13) that, while Black Sheep was interested in a sale, it was not "that interested," all the time knowing that the meeting was being tape recorded and having admittedly been previously advised by counsel regarding domain name issues. (Exhibit OO at 2).

[11] Sale offers made between counsel are admissible in UDRP proceedings. *See The Vanguard Group, Inc. v. Emilio Sa*, WIPO Case No. D2001-1453, available here: http://www.wipo.int/amc/en/domains/decisionsx/index-gtld.html.

marks.  At no time during any discussions with Black Sheep regarding the potential purchase of

the site did the Town agree that Black Sheep could use the Town's AIRPORT MARKS or indicate

that the Airport sponsored or endorsed Black Sheep's sites in any way.  Rather the contrary is true

in that the Town sent Black Sheep a cease and desist letter demanding that Black Sheep stop using

certain domain names as the sites were creating consumer confusion.

## C.    The Content at <macarthurairport.com> Grievously Misleads The Public And Causes Irreparable Harm to the Airport.

The **<macarthurairport.com>** site is calculated to suggest that it is the official site for the

Airport.  The site makes abundant references to "Long Island MacArthur Airport:" the meta-tag

title and browser title of the home page states "Welcome to Long Island Islip Macarthur Airport."

The home page also boasts "Over 2 million visitors a year," which is a statistic that pertains to

usage *of the Airport*, not Internet traffic to Black Sheep's site. In a similarly deceptive manner, the

**<macarthurairport.com>** home page also states: "Welcome to the most convenient airport in the

New York Metro area…Easy to get to. Easy to Leave. Easy to travel. Easy to Park"; and

Respondent uses phrases such as "*our* airlines page" and "*our* important airport service related

numbers" throughout the site. (emphasis added). (Exhibit Q).

The full extent of the proliferation of content that is likely to confuse consumers about the

party responsible for the site or about the Airport's role in, or endorsement of, the site is described

in detail in the Rizzuto Declaration (Exhibit E) and the Verified Counterclaim.  The misleading

nature of the site though is clearly evident from the numerous documented instances of actual

confusion. Beginning in late July 2010, the Airport began to maintain a log of callers who

complain about errors on the **<macarthurairport.com>** site, mistakenly believing that the site is

operated by the Airport.  None has ever mentioned Black Sheep's feeble attempt at a disclaimer.[12]

---

[12] Until just prior to the filing of this law suit, screen shots of **<macarthurairport.com>** confirm that the only hint that Black Sheep lacks an official relationship with the Airport is on the "Advertising" page where a small statement

Through the end of October 2010, at least 45 complaints about content on <**macarthurairport.com**> have been lodged with the Airport by the main switchboard operator. (Exhibit H). The complaints continue to come in on a daily basis.

Even Southwest Airlines, an advertiser on the <**macarthurairport.com**> site and the airline that schedules the most flights in and out of the Airport, expressed to the Town its dismay about the <**macarthurairport.com**> site, having been under the false impression that the Town owned and operated the site. (Exhibit E, Rizzuto Decl. ¶ 36).  Similarly, on or about June 10, 2008, when a production editor for a brochure on "How to get to and from" the New York airports requested permission to "reproduce the terminal map that appears on the airport's website in our brochure," and indicating that the URL for the map is the following: <www.macarthuairport.com/pages/terminal.shtml>.  The email makes clear the author believed the Town owned and operated <**macarthurairport.com**>. (Exhibit E, Rizzuto Decl. ¶ 37 and Exhibit BB).

Black Sheep perpetuates and encourages the above-mentioned infringements and confusion as to the owner and operator of <**macarthurairport.com**>. As a result, Airport consumers labor under the misimpression that the Airport is responsible for the inaccurate and unreliable information posted on <**macarthurairport.com**>, resulting in irreparable harm to the Town's reputation for convenience with regard to the Airport and for customer service excellence, and to the goodwill the Town has worked hard to develop from Airport consumers and the airline industry. Black Sheep has created this confusion in bad faith to exploit the advertising and pay-per-click revenue it receives from increased traffic to its site versus the Airport's site

---

appears: "macarthurairport.com is not governmentally owned . . . ."  That statement, buried in a location of interest primarily to potential advertisers, fails to eliminate potential confusion among the site's users as to the Airport's role or sponsorship or endorsement of the site. (Exhibit Q). In addition, even today, the disclaimer appearing on <**macarthurairport.com**> is minuscule and fails to negate Black Sheep's years of confusing the public regarding the source of information on the site.

<**flylima.com**>, depriving the Town of Islip of this source of revenue. Given the frequency with which the AIRPORT MARKS are searched, as shown in the Google AdWords searches, it is clear that the owner of domains incorporating such marks stands to gain significant revenue. (Exhibit J).

**D.    Black Sheep's UDRP Filings Confirm Its Status as a Cybersquatter.**

In filings before the UDRP tribunal, Black Sheep never challenged the Town of Islip's more than sixty (60) year history of operation under the AIRPORT MARKS.  Indeed, Black Sheep tacitly honors the Town's rights in the AIRPORT MARKS by repeatedly using the AIRPORT MARKS to refer to the Airport. This practice occurs throughout Black Sheep's UDRP Response, in the supposed "transcripts," and in the past correspondence and emails that also appear in the annexes. (*See, e.g.,* Exhibit KK ¶ 9 at 3 (". . . upon searching the internet and discovering that there were no registered domain names for Macarthur Airport . . . "; ". . . Respondent has operated a Macarthur Airport website. . ."; "the Town of Islip, the owners of Macarthur Airport", etc.).  Nor did Black Sheep try to suggest the disputed domain names were not "confusingly similar" or, indeed, identical to the AIRPORT MARKS or try to differentiate one of the disputed domains from any of the others.  *Id.*

## ANALYSIS

### I.    THE TOWN IS ENTITLED TO PRELIMINARY RELIEF TRANSFERRING THE DOMAIN NAMES

To obtain a preliminary injunction, the party seeking the injunction must demonstrate (1) a likelihood of irreparable injury in the absence of an injunction, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of the hardships tipping decidedly toward the party requesting the injunction. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009); *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003). As demonstrated below, the Town of Islip satisfies this standard and is entitled to injunctive relief.

13

**A.     BLACK SHEEP'S CONDUCT IS CAUSING IMMEDIATE AND IRREPARABLE HARM TO THE PUBLIC AND THE AIRPORT**

By misappropriating the AIRPORT MARKS in numerous domain names, Black Sheep is not only trading on the Town of Islip's earned goodwill, but also depriving the Town of the ability to control its reputation and the services offered under its name and mark. This harm cannot be quantified and is irreparable. Every day that Black Sheep operates with the Airport's name, the ability of the Airport to signify its services and its reputation by the AIRPORT MARKS is lessened.  In addition, the traveling public is continually injured and inconvenienced by the misleading nature of <**macarthurairport.com**>.

A presumption of irreparable harm may arise in several contexts, each of which applies to this case. First, it is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) ("[I]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial."); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 136 (S.D.N.Y. 1993) ("[T]he loss of goodwill and reputation... simply cannot be compensated adequately by an award of money damages"). Black Sheep's operation of a deceptively official-looking web site that is rife with misinformation and that directs travelers to unreliable services and vendors unaffiliated with the Airport clearly deprives the Town of the ability to control its reputation.

Second, where there is likely confusion, the requisite irreparable harm is established as a matter of course. *See Zino Davidoff SA*, 571 F.3d at 246-47 (a "plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury."); *Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458(RJS), 2010 WL 308303, at *2 (S.D.N.Y. Jan. 20, 2010) (noting that "in a trademark case, irreparable

injury is established where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."); *E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008) (granting preliminary injunction and noting that in the preliminary injunction context, "where the plaintiff has a protected mark, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm"); *Multi-Local Media Corp. v. 800 Yellow Book Inc.*, 813 F.Supp. 199, 205 (E.D.N.Y. 1993) ("Where a plaintiff in a trademark case has established a likelihood of consumer confusion, irreparable injury ... almost inevitably follows and, indeed, is presumed."). As described more fully in the Rizzuto Declaration (Exhibit E) and the Verified Counterclaim, the Town receives daily calls from confused travelers and airlines as a result of Black Sheep's site.

Finally, "in cybersquatting cases, 'irreparable harm may be presumed where there is a likelihood of success on the merits.'" *Webadviso v. Bank of America Corp.*, No. 09 Civ 5769, 2009 WL 5177997, at *3 (S.D.N.Y. Dec. 31, 2009) (quoting *Vogster Entertainment, LLC v. Mostovoy,* No. 09 Civ. 1036, 2009 WL 691215, at *6 (E.D.N.Y. Mar. 16, 2009)).

Because the record overwhelmingly demonstrates that Black Sheep's use of the AIRPORT MARKS deprived the Airport of the ability to control its reputation and resulted in actual confusion of its traveling customers, the Town has shown continuing and irreparable injury in the absence of injunctive relief.  Further, as established below, the Town is entitled to a presumption of irreparable harm due to its likely success on its § 43(d) claim.

**B.     THE TOWN OF ISLIP IS LIKELY TO SUCCEED ON THE MERITS OF ITS ACPA CLAIM**

The Verified Counterclaim sets forth Seven Claims for Relief arising out of Black Sheep's infringing use of the AIRPORT MARKS as domain names. Based upon the application of settled law to the undisputed facts, the Town of Islip is likely to succeed on the merits of each of its

claims, however, at this juncture, the immediate relief sought by the Town of Islip is the transfer of the sixteen (16) domain names which incorporate all or part of the AIRPORT MARKS pursuant to the Town's likelihood of success as to its ACPA claim.

The ACPA was enacted to prevent cybersquatting, an expression that has come to mean the bad faith and abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks. *See Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000). To successfully assert a claim under the ACPA, a plaintiff must demonstrate that: (1) that the defendant has a bad faith intent to profit from that mark; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's marks; and (3) its marks were distinctive at the time the domain name was registered. *See* 15 U.S.C. § 1125(d)(1); *Sporty's*, 202 F.3d at 497-99; *Broadbridge Media, L.L.C. v. hypercd.com*, 106 F. Supp. 2d 505, 510 (S.D.N.Y. 2000) (granting preliminary injunction); *see also Vogster Entertainment, L.L.C. v. Mostovoy*, No. 09-CV-1036 (RRM)(RER), 2009 WL 691215, at *4 (E.D.N.Y. Mar. 16, 2009) (same).

1.    <**Macarthurairport.com**> and the Resolving Domain Names are Being Used with a "Bad Faith Intent to Profit" from the Town

While Black Sheep's bad faith intent to profit from the AIRPORT MARKS is almost self-evident from the facts presented herein, the ACPA provides a non-exhaustive list of factors a court may consider in assessing bad faith.[13] 15 U.S.C. § 1125(d)(1)(B)(i). The Town's record establishes at least six (6) of the statutorily-defined bad faith factors.

---

[13] Six of nine factors enumerated in the ACPA are relevant to the present matter. Those six are: (1) the rights of the person (here, Black Sheep), if any, in the domain name; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain; and (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names.

In evaluating the **first** ACPA bad faith factor, it is undisputed that Black Sheep has never operated under a name similar to any of the AIRPORT MARKS and therefore cannot and does not possess any rights to <**macarthurairport.com**> and the resolving domain names. In addition, Black Sheep neither has priority rights in the domain names, as the Town's use long pre-dated registrations, nor is it affiliated with the Town or otherwise authorized to use the AIRPORT MARKS.

The ACPA's **third**, **fourth**, **fifth** and **eighth** bad faith factors, analyzed collectively in conjunction with the UDRP record, evidence Black Sheep's bad faith. The UDRP record contains exhaustive evidence of Black Sheep's intent to mislead the public through its registration of infringing domain names and display of infringing and misleading content on its sites. Black Sheep's principal, Ditte, admitted that he seized upon the AIRPORT MARKS precisely because he knew of the Airport and realized the Town officials had not yet registered domain names incorporating the AIRPORT MARKS. (Exhibit LL, Ditte Decl. ¶ 3). "The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark." *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008) (citation omitted); *see also Pfizer, Inc. v. Sachs*, 652 F. Supp. 2d 512, 523  (S.D.N.Y. 2009) (noting that defendants were aware of plaintiff's marks and that defendants refused to comply with plaintiff's cease-and-desist letters). It is evident that Black Sheep had the clear intention to capitalize on the Airport's reputation and goodwill by fostering confusion between <**macarthurairport.com**> and the Airport services offered by the Town. Black Sheep's registration of thirteen (13) more domain names and four (4) Twitter accounts incorporating the AIRPORT MARKS, after receipt of the May 13, 2009 cease and desist letter, provides further abundant evidence of bad faith. (Exhibit B (comparing infringing marks); Exhibit E, Rizzuto Decl. ¶ 31-32). Black Sheep's pattern of bad faith conduct is still further

17

evidenced by its registration of domains similar to the names of several other airports, including <twincitiesairport.com> and <charlottedouglasintlairport.com>. (Exhibit U).

Additionally, as set forth in detail in the Rizzuto Declaration (Exhibit E) and the Verified Counterclaim, <**macarthurairport.com**> repeatedly references "Long Island MacArthur Airport" and, in fact, the meta-tag title and browser title of the site each state: "Welcome to Long Island Islip Macarthur Airport." The misleading nature of the <**macarthurairport.com**> site is also evident in the home page's reference to "Over 2 million visitors a year," which is a statistic that pertains to the Airport, not to the web site traffic. In a similarly confusing manner, the <**macarthurairport.com**> home page also states: "Welcome to the most convenient airport in the New York Metro area…Easy to get to. Easy to Leave. Easy to travel. Easy to Park"; and Respondent uses phrases such as "**our** airlines page" and "**our** important airport service related numbers" throughout the site. (emphasis added). (Exhibit Q). Finally, for many years prior to this action, Black Sheep prominently displayed a logo confusingly similar to the AIRPORT WINGS DESIGN MARK and failed to display a disclaimer of any relationship to the Town and the Airport. The only "disclaimer" present was on the "Advertising" page where a small statement appears as follows: "macarthurairport.com is not governmentally owned . . . ."  That statement, buried in a location of interest primarily to potential advertisers, failed to eliminate potential confusion among the site's users as to the Airport's role or sponsorship or endorsement of the site; though even with the existence of a disclaimer, as discussed in the section below, Black Sheep cannot overcome its blatant attempt to divert consumers from the Airport to the infringing web site for the purpose of profiting from the resultant confusion through advertising revenue. There is no other logical explanation for why Black Sheep choose the precise wording of the AIRPORT MARKS as domain names on over a dozen occasions and designed the content of its site in such a deceptive manner. *See Kraft*, 831 F. Supp. at 132 ("When a company appropriates an identical

mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark....).

Finally, the **sixth** ACPA bad faith factor is present, because an offer "to transfer, sell, or otherwise assign" the domain name for financial gain shows bad faith. As explained in detail above, Black Sheep has offered to sell all or at least part of its interest in the subject domain names on more than one occasion. Given the above, there can be no doubt that Black Sheep satisfies the bad faith element of a cybersquatting claim.

2. &lt;Macarthurairport.com&gt; and the Resolving Domain Names are Identical or Confusingly Similar to the AIRPORT MARKS and Will Continue to Cause Confusion if Not Transferred to the Town

Ample evidence exists that the sixteen (16) domain names in dispute are identical or at least confusingly similar to the AIRPORT MARKS. In each of the disputed domain names, the AIRPORT MARKS are either used alone, accompanied by a generic term such as "online", or intentionally misspelled. As the Court found in *Vogster*, and as is well-established, the registration of domain names "with the mere addition of the words "award," "awards," or "game"" is a violation of the ACPA. 2009 WL 691215, at *4 (finding that &lt;vogsterawards.com&gt; and other similar sites infringed upon plaintiff's "Vogster" mark). It is similarly well-established that the registration of domain names that are intentional misspellings of distinctive or well-known names (known as "typosquatting") is actionable under the ACPA. *See Dudley v. Healthsource Chiropractic, Inc.,* 585 F. Supp. 2d 433, 440 (W.D.N.Y. 2008); *Shields v. Zuccarini,* 254 F.3d 476, 483-84 (3d Cir. 2001) (stating that "to register a domain name in anticipation that consumers would make a mistake, thereby increasing the number of hits [the] site would receive, and, consequently, the number of advertising dollars [defendant] would gain" was "a classic example of a specific practice the ACPA was designed to prohibit").

2435995-01

Furthermore, even if web surfers eventually discover that <**macarthurairport.com**> is not affiliated with Town (which evidence suggests otherwise), the "initial confusion" associated with the misdirection of traffic to Black Sheep's web site is confusion that is cognizable under the Lanham Act. In *Green Prods. Co. v. Independence Corn By-Prods. Co.*, for example, the court entered a preliminary injunction transferring <greenproducts.com> to the trademark holder, finding that although the registrant did not intend to pass off its products as those of the trademark holder, it "did intend to pass off its domain name as though it belonged to Green Products. As a result of the confusion in thinking that Green Products' web site could be found through the "greenproducts.com" domain name, [defendant] could deceptively lure potential customers onto its own turf . . . ." 992 F. Supp. 1070, 1076 (N.D. Iowa 1997). The court found "that such a deceptive use of a competitor's trademark as a way to lure customers away from the competitor is a kind of consumer confusion." *Id.* at 1078. Assuming for the sake of argument that Black Sheep's web site was not infringing and that he offered only genuine Airport information, his use of <**macarthurairport.com**> would nevertheless be similarly deceptive because he is luring customers (and advertising revenue) away from the Airport and the services it offers.

As further evidence of the high likelihood of confusion, Black Sheep has recently placed a disclaimer at the bottom of <**macarthurairport.com**> in minuscule print that states:

> Note: Information on this website may change without notice. We are not responsible for errors you may find on this site. Information on listed businesses does not represent an endorsement of those businesses. This website is a private business and is not owned or operated by the Town of Islip, the owner operators of the Airport

Use of such a disclaimer serves as an acknowledgement by Black Sheep that it expects the unauthorized use of the AIRPORT MARKS in the disputed domain names and on the <**macarthurairport.com**> site will lead to consumer confusion. Even when unambiguous and prominently displayed, which the disclaimer on <**macarthurairport.com**> is not, disclaimers on

2435995-01

Internet websites are often deemed ineffective because they do not account for the fact that "initial confusion" has already led unsuspecting consumers to a website that is not affiliated with the trademark owner. *See, e.g., New York State Soc. of Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331 (S.D.N.Y. 1999) (explaining "disclaimer defense" "ignores the initial confusion caused by defendant's use of [an infringing domain name and meta-tag]. Persons using them are expecting to arrive at the [plaintiff's] web site."); *Planned Parenthood Fed'n of America, Inc. v. Bucci*, 42 U.S.P.Q.2d 1430, 1441 (S.D.N.Y. 1997) ("Due to the nature of Internet use, defendant's appropriation of plaintiff's mark as a domain name and home page address cannot adequately be remedied by a disclaimer. Defendant's domain name and home page address are external labels that, on their face, cause confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site.").

      3.     The AIRPORT MARKS Were Strong and Distinctive At the Time Black Sheep Registered <macarthurairport.com> and the Resolving Domain Names

The LONG ISLAND MACARTHUR AIRPORT and AIRPORT WINGS DESIGN MARK are registered marks and therefore presumed distinctive. These marks were first used decades before the year 2000 when Black Sheep began registering domain names infringing upon the AIRPORT MARKS. The FLYLIMA MARKS are inherently distinctive and are currently pending registration. The first use of these marks also occurred prior to Black Sheep's registration of the related domains.  Indeed, Black Sheep's registrations occurred in response to the Town's cease and desist letter regarding Black Sheep's infringing conduct.

The marks MACARTHUR AIRPORT, ISLIP AIRPORT, ISLIP MACARTHUR AIRPORT AND ISP have become distinctive through "secondary meaning", i.e., the ability of the marks to signify the Town of Islip as the exclusive source of the services at issue to an appreciable

number of consumers.[14] In determining whether a mark has acquired secondary meaning, the Second Circuit has set forth a number of factors that can be considered: 1) advertising expenditures; 2) sales success; 3) unsolicited media coverage; 4) attempts to plagiarize the mark; 5) the length and exclusivity of use; and 6) consumer studies linking the name to a source. *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985); *Philip Morris USA Inc. v. Cowboy Cigarette Inc.*, No. 03 Civ. 2292 (JSR), 2003 WL 22852243, at *2 (S.D.N.Y.). "[N]o single factor among the six is determinative, and every element need not be proved." *Simon & Schuster Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 295 (S.D.N.Y. 1997).

Application of the secondary meaning factors leaves no question that the Town has achieved secondary meaning in the above-referenced marks sufficient to entitle it to common law rights in the marks. The Town has been using the surname MACARTHUR in connection with the Airport since the 1940s, and the Airport is the only airport incorporating the famous General MacArthur's name. The Airport was originally named MACARTHUR AIRPORT pursuant to a 1942 Town resolution. ISLIP AIRPORT was then the official name of the Airport for over 15 years. ISLIP MACARTHUR AIRPORT was the official name of the Airport for over 10 years. ISP has been the unique Airport code for the Airport, upon information and belief, for over six decades, appearing on among other things, Airport baggage tags, flight monitors, Airport tickets, and all flight purchase and availability search engines. The above marks are also distinctive in that each mark clearly designates a facility - MacArthur Airport - as opposed to describing a general geographic location, and there is only one commercial airport in Long Island owned by the Town of Islip. Furthermore, over the years, the Airport is still often referred to as MACARTHUR AIRPORT, ISLIP AIRPORT, ISLIP MACARTHUR AIRPORT and ISP in numerous examples of

---

[14] The Second Circuit's *Abercrombie*'s continuum to determine the validity of a mark finds at one end, fanciful and arbitrary marks such as KODAK and XEROX and at the other, generic terms, such as MILK for milk. Descriptive and suggestive marks fall in between those two extremes. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)

unsolicited media coverage of the Airport and events occurring in and around the Airport. These marks are also constant subjects of Google searches as shown by the above-referenced Google AdWord data for a recent twelve (12) month period. (Exhibit J).

In addition to the Airport's length and exclusivity of use of the MACARTHUR surname and the ISLIP related marks in connection with aviation services, the success of the Airport is apparent through the Airport's considerable expansion. The Town has invested over $60 million into the expansion and renovation of the Airport, and has embarked on multiple marketing campaigns to publicize the Airport. Currently, over two (2) million passengers use (with a capacity of approximately two (2) more million) the Airport each year, with an average of over 3,000 flights each week serving cities throughout the United States. In addition, the Town has spent over $500,000 in 2009, and is budgeted to spend $300,000 in 2010, in connection with the promotion of the Airport. Further, in 2009, the Airport generated over $12 million in revenue. The Airport and services related to it provide 800 to 1,000 jobs to local residents and are indirectly responsible for approximately 2,000 jobs. Also, a 2004 study conducted by Hofstra University estimated that the Airport contributed $200 million to the Long Island economy and resulted in an incremental increase in employment in excess of 1,700 from 1993 to 2004.

Finally, Black Sheep's theft of the AIRPORT MARKS provides further evidence of secondary meaning. *See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998) ("[A]ttempts to plagiarize a mark is the most persuasive, if not conclusive, factor in favor of finding secondary meaning."). Black Sheep deliberately seized <**macarthurairport.com**> and the resolving domain names because they incorporated the AIRPORT MARKS.  Further, as discussed in the bad faith analysis below, within the content of <**macarthurairport.com**>, Black Sheep repeatedly plagiarizes the Town's registered LONG ISLAND MACARTHUR AIRPORT and

AIRPORT WINGS DESIGN MARK. Black Sheep also plagiarizes the AIRPORT MARKS on certain infringing Twitter accounts set forth in the Verified Counterclaim.

Given the success of the Airport, its extensive media coverage, and the strong reputation the Airport has developed among consumers, the AIRPORT MARKS have all obtained secondary meaning and can be considered strong marks. *GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (granting plaintiff injunctive relief and noting that "[s]econdary meaning exists where the public is moved in any degree to buy an article because of its source."); *see Reno Air Racing Ass 'n, Inc. v. McCord*, No. CV-N-02-0474 (HDM) (RAM), 2004 WL 3561191, at *4-5 (D. Nev.) (holding "Reno Air Races" used in connection with an air racing event had acquired secondary meaning); *Pocono Int'l Raceway, Inc. v. Pocono Mountain Speedway, Inc.*, 171 F. Supp. 2d 427, 439-40 (M.D. Pa. 2001) (finding secondary meaning for "Pocono Raceway" and "Pocono" used in connection with an auto racing event and raceway).

Since the Town of Islip has clearly proven likely success on all three elements required to demonstrate a violation of Section 43(d), it respectfully requests that the Court preliminarily compel the transfer to the Town of Islip of the sixteen (16) domain names in question.

## II.     BLACK SHEEP HAS NO DEFENSE TO THE TOWN'S REQUEST FOR INJUNCTIVE RELIEF

Black Sheep cannot rely upon the passage of time since its reservation of <**macarthurairport.com**> to defeat the Town of Islip's request for injunctive relief. Where the likelihood of confusion exists, injunctive relief will still be entered to protect the public interest. *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). Evidence of harm to the public as well as confusion of the public from Black Sheep's rogue web site is overwhelming. The public interest in insuring that accurate information is disseminated in the event of an aviation disaster or emergency also requires injunctive relief, regardless of the passage of time. Further, laches, acquiescence or other

24

analogous defenses, if the elements are present, are only defenses to damages, not to injunctive relief. *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 320 (6th Cir. 2001); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 33 U.S.P.Q.2d 1961, 1974 (E.D.N.Y. 1994). Laches, acquiescence, estoppel and the like are also not available against governmental entities. *U.S. v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002); *United States v. Lemos*, 2010 WL 1192095, at *2 (S.D.N.Y. 2010); *United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 274 (S.D.N.Y. 2009); *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 323 (S.D.N.Y. 2001); *United States v. Alfano*, 34 F. Supp. 2d 827, 835 (E.D.N.Y. 1999). New York federal and state courts have applied this principle to governmental entities, including to the State of New York, *Inc. Village of Garden City v. Genesco, Inc.*, 596 F. Supp. 2d 587, 610 (E.D.N.Y. 2009), to administrative agencies acting in their governmental capacities, *Flacke v. NL Indus., Inc.*, 644 N.Y.S.2d 404 (N.Y. App. Div. 1996), and to municipalities, *Matter of Fowler v. City of Saratoga Springs*, 626 N.Y.S.2d 306, 307 (N.Y. App. Div. 1995).

The undisputed facts defeat any laches argument for numerous other reasons. Delay on the part of the Town of Islip not unreasonable. *Fourth Toro Family Ltd. Partn. v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 197-98 (S.D.N.Y. 2000). A plaintiff may rebut a defense of laches in a trademark case by showing that a defendant "has made recent inroads on the plaintiff's interests, such as by entering the plaintiff's geographic market, . . . altering a mark to make it more similar to the plaintiff's, . . . or extending a mark to goods or services that more directly compete with the plaintiff's . . . ." *Solow Bldg. Co. v. Nine West Grp., Inc.*, 48 Fed. Appx. 15, 15-16 (2d Cir. 2002). Here, the Town tried unsuccessfully to negotiate with Black Sheep. Once those efforts failed, a cease and desist letter failed, and Black Sheep expanded its infringing conduct to Twitter, the Town pursued litigation, first before the UDRP process, and now before this Court. Any delay

before litigation was reasonable. Black Sheep also cannot show undue prejudice, which is narrowly defined as is. "'[M]ere delay' will not, by itself, bar a plaintiff' suit, but that there must be some element of estoppel, such as reliance by the defendant." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980); *Costello v. United States*, 365 U.S. 265, 283 (1961). Nor is Black Sheep even entitled to laches, because the defense is not available against injunctive relief in a trademark action when a defendant intended the infringement. *Hermès Intl. v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (citing *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir.1981)). "This good-faith component of the laches doctrine is part of the fundamental principle that 'he who comes into equity must come with clean hands.'" *Id.* (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). Therefore, the passage of time should play no role in the outcome of this case.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant a preliminary injunction in favor of the Town of Islip and order the transfer of the disputed domain names to the Town.

CONNELL FOLEY LLP
Attorneys for Defendant/Counterclaim-Plaintiff
The Town of Islip

/s/ Peter J. Pizzi
By:_____
Peter J. Pizzi

Dated:  November 8, 2010

26